FILED

2022 Mar-22  PM 12:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| **RACHEL HALLMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 7:20-cv-01424-AMM** |
| | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Rachel Hallman brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.     Introduction

On February 19, 2018, Ms. Hallman protectively filed an application for benefits under Title II of the Act, alleging disability as of November 3, 2014. R. 25, 158–59. Ms. Hallman alleges disability due to bipolar disorder, borderline personality disorder, fibromyalgia, anxiety, irritable bowel syndrome, depression, and bursitis. R. 73. She has at least a high school education, is able to communicate

in English, and has past relevant work experience as a medical receptionist and security guard. R. 7.

The Social Security Administration ("SSA") initially denied Ms. Hallman's application on March 23, 2018. R. 25, 71–79, 83–87. On April 4, 2018, Ms. Hallman filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 25, 88–89. That request was granted. R. 90–92. Ms. Hallman received a video hearing before ALJ Emilie Kraft on July 22, 2019. R. 25, 40–70. On September 24, 2019, ALJ Kraft issued a decision, finding that Ms. Hallman was not disabled from November 3, 2014 through her date of last insured, September 30, 2016. R. 22–34. Ms. Hallman was thirty-six years old at the time of the ALJ decision. R. 33–34.

Ms. Hallman appealed to the Appeals Council, which granted her request for review on June 3, 2020. R. 4, 140–48. On July 22, 2020, the Appeals Council issued a decision, finding that Ms. Hallman was not disabled from November 3, 2014 through September 30, 2016. R. 1–8. The Appeals Council's decision became the final decision of the Commissioner and subject to district court review. On September 24, 2020, Ms. Hallman sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.    The Appeals Council's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging

2

in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id. Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20

C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id*. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with his residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

In its notice granting the requested review of the ALJ decision, the Appeals Council stated that it found "an error of law." R. 143. In its decision, the Appeals Council considered the following additional evidence that Ms. Hallman previously submitted to the hearing office, but was not considered by the ALJ: a medical source statement from Dr. Kamal Raisani dated July 29, 2019; a letter from Julie Wilson dated November 3, 2014; and pharmacy prescriptions records from Alabama CVS Pharmacy dated December 4, 2018. R. 5, 143–48. The Appeals Council also informed Ms. Hallman that "it would consider a statement about the facts and the

law in the case, or additional evidence," but it received no statement or additional evidence. R. 4.

The Appeals Council adopted the ALJ's "findings at steps one, two, and three of the sequential evaluation." R. 4. The Appeals Council determined that Ms. Hallman last met the insured status requirements of the Act on September 30, 2016. R. 6. Next, the Appeals Council found that Ms. Hallman did not engage in substantial gainful activity from her alleged onset date through her date of last insured. R. 7. The Appeals Council decided that Ms. Hallman had the following severe impairments: severe fibromyalgia, obesity, bilateral trochanteric bursitis, major depressive disorder, and generalized anxiety disorder. R. 7. Overall, the Appeals Council determined that Ms. Hallman did not have "an impairment, or combination of impairments, that meets or medically equals one of the listed impairments" to support a finding of disability. R. 4.

The Appeals Council found that, "through the date last insured," Ms. Hallman's "statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence of record." R. 5–6. The Appeals Council adopted the decision of the ALJ and found that Ms. Hallman had the "residual functional capacity to perform a range of light work" with certain limitations. R. 6. The Appeals Council determined that Ms. Hallman is limited to occasionally climb ramps and stairs and occasionally

balance, stoop, kneel, crouch, or crawl. R. 6. The Appeals Council determined that Ms. Hallman must: not climb ladders, ropes, or scaffolds; and avoid exposure to unprotected heights or hazardous machinery. R. 6. Further, the Appeals Council noted that Ms. Hallman can understand, remember, and carry out simple instructions; have occasional contact with the general public; and adapt to infrequent, gradual changes in the work environment. R. 6.

According to the Appeals Council, Ms. Hallman was "not capable of performing her semi-skilled past relevant work as a medical receptionist and security guard," she was "a younger individual" on the alleged onset date, and she has "at least a high school education," as those terms are defined by the regulations. R. 7. The Appeals Council determined that "[t]ransferability of job skills is not an issue in this case because using the Medical-Vocational Rules as a framework supports a finding of 'not disabled,' whether or not [Ms. Hallman] has transferable job skills." R. 7. The Appeals Council also adopted the ALJ's "finding at step five that [Ms. Hallman] is capable of performing the following representative occupations identified by the vocation expert at the hearing:" assembler, hand packager, and laundry folder. R. 6. The Appeals Council found that "these representative occupations constitute a significant number of jobs in the national economy." R. 6.

Based on these findings, the Appeals Council concluded that Ms. Hallman was disabled as defined in the Act, from November 3, 2014 through September 30, 2016. R. 6. Ms. Hallman now challenges that decision.

## III. Factual Record

The medical records included in the transcript begin before the alleged onset date and extend beyond the date of last insured. However, the period relevant to the Commissioner's disability determination is November 3, 2014 through September 30, 2016. R. 6.

### A. Pre-Onset Records

Ms. Hallman presented to the Clinic for Rheumatic Diseases on August 22, 2013, complaining of "[s]evere pain all over." R. 237. She rated her pain as a 10/10 and her fatigue as an 8/10. R. 237. She was diagnosed with fibromyalgia and prescribed Cymbalta 30 mg. R. 237, 239.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on September 17, 2013 complaining of "bilateral leg, arm, neck[,] and big toe on right foot pain." R. 234. She reported that her bilateral hip pain had "gotten some better" since she started taking Mobic. R. 235. Ms. Hallman also stated that she couldn't "tell any difference in the Cymbalta 30 mg," that she "still hurts quite a bit," and that "sometimes she cannot even get out of bed in the morning." R. 235. Her Cymbalta was increased to 60 mg and she was provided with two other medications. R. 235.

Her musculoskeletal review noted that she had "some tight trapezius muscles" and "good range of motion of her neck." R. 236.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on November 21, 2013, to follow up on her fibromyalgia. R. 229. She reported "doing fairly well since we increased the Cymbalta to 60 mg a day and she also takes Mobic 15 mg religiously." R. 229. Ms. Hallman said "she is really happy and has not had those episodes which she used to have earlier." R. 229. The notes indicate that Ms. Hallman "has been seen by Dr. Kevin Katona for depression for a long time now." R. 229. Ms. Hallman was still experiencing fatigue and tiredness, for which she received a prescription for B12 shots. R. 229. Her musculoskeletal review noted that she had "some tight trapezius muscles" and "good range of motion of her neck." R. 230.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on February 25, 2014. R. 227. Her Cymbalta was increased to 90 mg to assist with a "flare of her fibromyalgia," though the medical records note that she was "doing fairly well" on a 60 mg dose. R. 227. At this visit, Ms. Hallman had "some pain primarily . . . in her right lateral thigh, [which] seems like it is more iliotibial band syndrome" and "some right hip bursitis." R. 228.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on August 26, 2014 for fibromyalgia, left knee pain, and bilateral trochanteric bursitis. R. 376. The

symptoms were noted to be "moderate," though "[t]he problem is worsening[, and s]ymptoms occur persistently." R. 376. "Soft tissue discomfort" was noted, and she had two of eighteen tender points. R. 377. Ms. Hallman received injections and was scheduled to follow up in six months. R. 378.

### B. Disability Onset Date Through Date of Last Insured Records

Ms. Hallman presented to the Clinic for Rheumatic Diseases on February 24, 2015 for fibromyalgia and pharyngitis. R. 373. Ms. Hallman was "having more pain than usual but worked in [a] flower shop for Valentine[']s and has recently had a death in the family." R. 373. She reported pain at 9/10. R. 373. "Soft tissue discomfort" was noted, and she had eighteen out of eighteen tender points. R. 374. She was advised to follow-up in six months. R. 375.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on June 11, 2015 for bursitis, hip pain, and fibromyalgia. R. 370. She had "[t]enderness of the bilateral trochanteric bursa" and was given injections. R. 371.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on August 25, 2015 for fibromyalgia, chronic pain, low vitamin D3, and trochanteric bursitis. R. 367. Her musculoskeletal exam was normal, but "[s]oft tissue discomfort" was noted and she had two of eighteen tender points. R. 368.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on October 22, 2015 for fibromyalgia, bilateral trochanteric bursitis, low vitamin D3, and chronic

pain. R. 362. At the time she was "having bilateral trochanteric bursa pain" and "hurting in the tender points in her neck and upper back area." R. 362. While her musculoskeletal exam was normal, she had "[s]oft tissue discomfort" and eighteen out of eighteen tender points. R. 364. She received injections and was advised to return to the clinic in three months. R. 365.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on January 21, 2016 for fibromyalgia, chronic pain, low vitamin D3, and depression. R. 358. Ms. Hallman's physical exam revealed: "no swelling, tenderness, or limitation in the IP, MCP, wrists, elbows, shoulders, hips, knees, ankles, and MTP joints. Achilles tendon, plantar fascia, and the posterior tibial tendons examine normally. Cervical, thoracic, and lumbar spine have good alignment without scoliosis, tenderness, or deformity. Sacroiliac joints are nontender." R. 360. Ms. Hallman was advised to return to the clinic in six months. R. 361.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on May 4, 2016 with bilateral trochanteric bursa pain. R. 353. She was given steroid injections. R. 353. Her physical exam revealed mild pain with motion in the thoracic spine, normal gait, no tenderness of the cervical or lumbar spine, and no tenderness in the shoulders, elbows, hands, hips, knees, or feet/ankles. R. 355. She had two of eighteen fibromyalgia tender points. R. 355.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on July 21, 2016 with fibromyalgia, chronic pain, low vitamin D, and depression. R. 348. The notes indicate she was taking Cymbalta 60 mg and Flexeril 10 mg. R. 348. A review of Ms. Hallman's symptoms indicated she was experiencing back pain, morning stiffness, neck pain, and numbness in extremities. R. 349. However, her musculoskeletal exam showed no swelling in joints, normal tendons, and good alignment in the spine. R. 350. Her connective tissue exam revealed: "Soft tissue discomfort noted in the anterior neck, posterior neck, left posterior shoulder, right posterior shoulder, right chest, left chest, upper back, low back, right lateral epicondyle, left lateral epicondyle, left posterior thigh, right posterior thigh, right knee, left knee." R. 350. She had eighteen of eighteen fibromyalgia tender points. R. 350. Ms. Hallman was advised to follow up in six months. R. 351.

Ms. Hallman presented to University Family Practice on August 24, 2016 for a three-month chronic disease visit where she was treated for hypertension, generalized anxiety disorder, adjustment disorder with mixed anxiety and depressed mood, and irritable bowel syndrome with constipation. R. 278–79. The visit notes indicate that Ms. Hallman's fifteen-year old stepdaughter died and as a result she was experiencing panic attacks and worry but had not yet been to counseling. R. 279.

### C. Post-Date of Last Insured Records

Mr. Hallman followed up at University Family Practice on October 27, 2016, where she reported her depression was worse since the death of her stepdaughter. R. 280. Ms. Hallman stated her anxiety has been controlled with medication, and she was prescribed Abilify and advised to start grief counseling. R. 280. She reported that she was not currently seeing a psychologist, but a university counselor had been helpful in the past. R. 281. She complained of intermittent right lower back pain and neck stiffness, which is relieved by massage. R. 281. Ms. Hallman followed up on December 9, 2016, where Seroquel was prescribed instead of Abilify in an attempt to avoid drug-induced insomnia. R. 282.

Ms. Hallman was treated at Pathways Professional Counseling beginning January 4, 2017. R. 399. At her initial assessment, she said she was "seeking individual counseling to build her self-esteem and to get her marriage back on track" after "things changed [when] her step-daughter passed unexpectedly." R. 399. Ms. Hallman reported she did not work "due to her physical health." R. 400. Ms. Hallman met "the criteria for [a]djustment disorder with mixed anxiety and depressed mood." R. 400. On February 1, 2017, she reported mild depression and was diagnosed with bereavement. R. 398, 402. Ms. Hallman presented for counseling sessions from March 2017 through March 2018. R. 419–477.

University Family Practice referred Ms. Hallman to Dr. Kamal Raisani "for decline/change in mental health." R. 300. Her initial visit with Dr. Raisani was

March 20, 2017. At the visit, Ms. Hallman reported that her "depression had increased in intensity" since her stepdaughter's death in July 2016. R. 300. Dr. Raisani noted that Ms. Hallman had "significant depression" and had "been doing poorly" since her stepdaughter's death. R. 300. Ms. Hallman again saw Dr. Raisani on April 3, 2017, and she reported that she was "feeling better" and was "calmer, less depressed[,] and more focused." R. 304. Ms. Hallman again saw Dr. Raisani on May 18, 2017, and reported she was "in better spirits," "very happy about her progress," and "pleased . . . with her current progress and effectiveness of treatment." R. 308. Ms. Hallman again saw Dr. Raisani on August 21, 2017, where her medication was adjusted. R. 313, 315. Ms. Hallman again saw Dr. Raisani on October 24, 2017, and reported she was "in better spirits," "very happy about her progress," and "pleased . . . with her current progress and effectiveness of treatment." R. 316. Ms. Hallman again saw Dr. Raisani on January 8, 2018, where she assured Dr. Raisani she was "doing well" and in "better spirits," though "in the past [had] ruminated about taking her own life." R. 320.

Ms. Hallman presented to the Clinic for Rheumatic Diseases on January 12, 2017 for osteoarthritis, fibromyalgia, chronic pain, depression, and bilateral trochanteric bursitis. R. 343. Ms. Hallman presented to the Clinic for Rheumatic Diseases on July 11, 2017 for osteoarthritis, fibromyalgia, chronic pain, depression, and bilateral trochanteric bursitis. R. 335. Ms. Hallman presented to the Clinic for

Rheumatic Diseases on January 17, 2018 for osteoarthritis, fibromyalgia, chronic pain, and neck pain. R. 329. Ms. Hallman presented to the Clinic for Rheumatic Diseases on February 22, 2018, for bilaterial trochanteric injections that she had "before without problem." R. 325. Ms. Hallman presented to the Clinic for Rheumatic Diseases on July 17, 2018 for fibromyalgia and chronic pain. R. 512. Ms. Hallman presented to the Clinic for Rheumatic Diseases on February 4, 2019 for fibromyalgia. R. 518. Ms. Hallman presented to the Clinic for Rheumatic Diseases on June 3, 2019 for fibromyalgia. R. 524.

## IV.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the Appeal Council's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence.

*See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## V.    Discussion

Ms. Hallman alleges that the Appeals Council's decision should be reversed and remanded because: the "ALJ's hypothetical questions to the vocational expert did not adequately account for limitations in concentration, persistence, and pace"; and "[t]he Commissioner improperly rejected the testimony" of Ms. Hallman. Doc. 10 at 6–7.

## A. The ALJ's Hypothetical Questions to the Vocational Expert

Ms. Hallman argues that the ALJ relied on the Vocational Expert's testimony that "did not adequately account for limitations in concentration, persistence, and pace identified during the psychiatric review technique." Doc. 10 at 6. Specifically, Ms. Hallman alleges that the hypothetical question posed by the ALJ did not include the ALJ's express finding that she had a "moderate limitations in concentration, persistence, and pace." *Id.* at 7. This argument fails.

In the sequential evaluation, the psychiatric review technique requires the ALJ to assess a claimant's functional limitations in four areas, including concentration, persistence or pace, and rate a claimant's degree of limitation. 20 C.F.R. § 404.1520a(c)(3). The psychiatric review technique is "not a[ residual functional capacity] assessment" but is "used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." Social Security Ruling 96-8p, 1996 WL 374184, at *4 (July 2, 1996). "The mental [residual functional capacity] assessment used at steps 4 and 5 . . . requires a more detailed assessment . . . ." *Id.* In other words, the ALJ is not required to include "moderate limitations in concentration, persistence, or pace" in her residual functional capacity assessment or hypothetical question to the vocational expert. However, that does not mean the psychiatric review technique findings are irrelevant to the claimant's residual functional capacity assessment.

"In order for a Vocational Expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). The hypothetical question posed by the ALJ need not include impairments that the ALJ has properly determined to be unsupported by the evidentiary record. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). "Generally, an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical posed to the vocational expert to simple, routine tasks or unskilled work." *Rosario v. Comm'r*, 490 F. App'x 192, 195 (11th Cir. 2012) (citing *Winschel v. Comm'r*, 631 F.3d 1176, 1180–81 (11th Cir. 2011)). "However, if the medical evidence demonstrates that the claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace then limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *Id.* (cleaned up).

Here, the Appeals Council adopted the ALJ's evaluation of the severity of Ms. Hallman's mental health conditions using the special psychiatric review technique set forth in 20 C.F.R. § 404.1520a. R.5. With respect to concentration, persistence, and pace, the ALJ stated:

> The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has moderate limitations. The claimant concluded that she has limitations in completing tasks and

> maintaining a regular work schedule. On the other hand, the claimant said that she is also able to drive, prepare meals, handle her own medical care, and attend church. Additionally, the record fails to show any mention of distractability.

R. 29 (citations omitted).

The Appeals Council also adopted the ALJ's determination of Ms. Hallman's residual functional capacity. R. 6. After considering the "entire record," the ALJ found that Ms. Hallman has:

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl; have no exposure to unprotected heights or hazardous machinery; understand, remember, and carry out simply instructions; have occasional contact with the general public; and adapt to infrequent, gradual changes in the work environment.

R. 29. In making this finding, the ALJ specifically noted that "[i]n terms of [Ms. Hallman's] alleged mental impairments, there is no persuasive evidence that the claimant would be unable to adapt to the mental demands for at least unskilled work." R. 32. The ALJ supported this statement by noting that: Ms. Hallman did not establish care with a psychiatrist until six months after her date of last insured; Ms. Hallman's anxiety and depression were "fairly well-controlled on medication"; Ms. Hallman has had "largely normal mental status examinations with intact memory"; Ms. Hallman "did not have specialized mental health treatment prior" to her date of

last insured; Ms. Hallman has not been hospitalized for psychiatric reasons; and Ms. Hallman's anxiety and depression "were exacerbated as a result of situational stressors (grief over her stepdaughter's death) . . . [and] are classified as an adjustment disorder" in some treatment notes. R. 32.

Here, the ALJ expressly indicated that "there is no persuasive evidence that [Ms. Hallman] would be unable to adapt to the mental demands for at least unskilled work." R. 32. Ms. Hallman does not address this statement or the evidence on which the ALJ relied to reach this result. *See* Doc. 10 at 6–7. Additionally, even after finding that Ms. Hallman would be able to adapt to the mental demands of unskilled work, the ALJ's residual functional capacity limited Ms. Hallman to "simple instructions." R. 29. The ALJ included all of Ms. Hallman's residual functional capacity's limitations in the hypothetical she posed to the Vocational Expert. Therefore, the Vocational Expert's testimony was based on a proper statement by the ALJ and constitutes substantial evidence supporting the ALJ's decision.

### B. The Commissioner's Evaluation of Ms. Hallman's Testimony

Ms. Hallman next argues that the Commissioner erred in rejecting her testimony and that the "ALJ's determination about [Ms. Hallman's] daily activities was an inadequate basis for rejecting her testimony." Doc. 10 at 7–19.

A claimant's subjective complaints are insufficient to establish a disability. *See* 20 C.F.R. § 404.1529(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir.

1991). Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a claimant claims disability due to pain or other subjective symptoms. The claimant must show evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 404.1529(a), (b); Social Security Ruling 16-3p, 2017 WL 5180304, at *3-*4 (Oct. 25, 2017) ("SSR 16-3p"); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of a claimant's alleged symptoms and their effect on her ability to work. *See* 20 C.F.R. § 404.1529(c); *Wilson*, 284 F.3d at 1225-26. In evaluating the extent to which a claimant's symptoms affect her capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a claimant's symptoms, (3) the claimant's daily activities, (4) precipitating and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the claimant takes to relieve symptoms, and (8) any conflicts between a claimant's statements and the rest of the evidence. *See*

20 C.F.R. § 404.1529(c)(3), (4); SSR 16-3p at *4, *7-*8. To discredit a claimant's statements, the ALJ must clearly "articulate explicit and adequate reasons." *See Dyer*, 395 F.3d at 1210.

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in her decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.*

A credibility determination is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial evidence. *See Hand v. Heckler*, 761 F.2d 1545, 1548-49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom., Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). The Eleventh Circuit will not disturb a clearly articulated finding supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). However, a reversal is warranted if the decision contains no indication of the proper application of the pain standard. *See Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D.F.L. 1996) (holding that the ALJ's failure to articulate adequate reasons for only partially crediting the plaintiff's complaints of pain resulted in reversal). "The question is not . . . whether [the] ALJ could have

reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Social Security Ruling 12-2p governs how the Commissioner must consider fibromyalgia in the sequential evaluation process. *See* SSR 12-2p, 2012 WL 3104869 at *1, n.1 (July 25, 2012) ("[T]he policy interpretations in this SSR also apply . . . to claims above the initial level."). The Ruling "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment . . . and how we evaluate [fibromyalgia] in disability claims and continuing disability reviews under titles II and XVI of the Social Security Act." *See id*. at *1. It provides that "[a]s with any claim for disability benefits, before we find that a person with a[ medically determinable impairment] of [fibromyalgia] is disabled, we must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes . . . her from performing any substantial gainful activity." *Id.* at *2.

Ms. Hallman asserts that the Commissioner improperly rejected her testimony about her fibromyalgia, specifically that "she never knew what she would be able to do from one day to the next," that she would be confined to bed one to two days a week, that if she pushed herself she would be useless the next day, that she had to "pick and choose the activities that she would do," that even a small amount of work

at a flower shop was too hard on her, that her arm pain would cause her to drop what she was holding, and that she had to constantly change positions. Doc. 10 at 7–8 (citing hearing transcript testimony). She also argues that the ALJ erred because "performance of everyday activities of short duration do not disqualify a claimant from disability" and "the ALJ's findings about Ms. Hallman's daily activities misrepresent the record." *Id.* at 15.

After delineating the pain standard, the ALJ stated that "the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alternations in behavior, does not support the severity of symptoms she alleges." R. 30. When describing Ms. Hallman's symptoms, the ALJ wrote:

> At the hearing, she reported that she experienced stiffness. The claimant indicated that she had a hard time bending. During the relevant time frame, she reported difficulty getting out of bed. The claimant testified that she had some difficulty completing household chores such as washing dishes, cooking meals, taking the children to school and shopping. The claimant reported problems picking up a pot of water. She testified that she experienced pain when reaching. The claimant stated that she experienced stiffness after sitting. She reported that she could not get out of bed 1 or 2 days per week during the relevant time frame. The claimant testified that she occasionally attended church, but had to change positions. Furthermore, she stated that she occasionally performed seasonal work at a flower shop (Hearing Testimony).

R. 30. After considering and discussing the record medical evidence from the relevant time, R. 31, the ALJ described her assessment of Ms. Hallman's fibromyalgia as follows:

> The claimant has a history of treatment for fibromyalgia. Although the claimant experienced some discomfort from this condition, clinical records showed that she responded well to medication and routine care. She did not exhibit any significant limitations or pain that would preclude her from performing substantial gainful activity.
>
> While the claimant has been prescribed and has taken some appropriate medications for the alleged impairments, the record reveals that these medications have generally been effective in controlling the alleged symptoms. The claimant did not consistently allege any significant side effects.

R. 32 (citations omitted).

Along with her consideration of the record medical evidence during the relevant time period and hearing testimony, the ALJ considered Ms. Hallman's daily activities when making her credibility determination. R. 31–32. The ALJ described her assessment of Ms. Hallman's daily activities as follows:

> It is emphasized that the claimant has describe[d] daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Functionally, the claimant appeared to be reasonably active during the relevant time frame. In fact, the claimant reported retained abilities that provide support for part of the residual functional capacity conclusion in this decision. For instances, the claimant reported working in a flower shop for Valentine's Day. The claimant has also reported the following daily

activities: independent self-care and personal hygiene, light household cleaning, preparing simple meals, driving, caring for her young children and occasionally attending church. Such activities are inconsistent with those of an individual with allegedly debilitating physical and mental conditions.

R. 32 (citations omitted).

The Appeals Council expressly agreed with the ALJ that "through the date of last insured, [Ms. Hallman's] statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence of record." R. 5. In making this assessment, the Appeals Council considered the evidence that was not considered by the ALJ. R. 5. *First*, the Appeals Council considered a medical source statement from Dr. Raisani dated July 29, 2019, but found it unpersuasive because it "is dated almost three years after the date of last insured," it "does not indicate that the limitations opined were present during the period prior to the date last insured," and Ms. Hallman "did not begin treating with Dr. Raisani until . . . approximately 6 months after the date last insured." R. 5. *Second*, the Appeals Council considered a letter stating that Ms. Hallman was terminated from her employment on November 3, 2014, and found that "this letter coincides with the alleged onset date and that it is evidence that [Ms. Hallman] had difficulty interacting with members of the public." R. 5. *Third*, the Appeals Council considered a pharmacy prescription history for prescriptions filled between December 15, 2017 and December 3, 2018, but found because it "relate[d]

to a period well after the September 30, 2016 date last insured, it is of minimal evidentiary value." R. 5.

The findings by the ALJ and Appeals Council that Ms. Hallman's medical evidence and daily activities were inconsistent with her allegations of total disability is supported by substantial evidence. Both the medical evidence and Ms. Hallman's daily activities indicate a level of activity that reasonably supports the ALJ's residual functional capacity of light work with further restrictions. R. 32.

As an initial matter, both the ALJ and Appeals Council considered Ms. Hallman's fibromyalgia throughout their decisions and found that it was a medically determinable severe impairment. R. 4–7, 27–32. Thus the ALJ and Appeals Council complied with Social Security Ruling 12-2p concerning the evaluation of fibromyalgia. Moreover, the mere diagnosis of an impairment says nothing about its severity or limiting effects. *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (stating that the relevant concern is the extent to which claimant's impairments, by whatever name or diagnosis, limited her ability to work). As discussed below, Ms. Hallman has not offered any evidence to establish how her fibromyalgia resulted in any restrictions on her ability to work in excess of her assessed residual functional capacity for a modified range of light work.

The ALJ thoroughly discussed the medical evidence from pre-onset through the relevant time period. R. 31. While Ms. Hallman experiences flare-ups of her

fibromyalgia, she consistently showed improvement with changes in her medication. R. 31, 227, 229, 235, 237, 239. The ALJ specifically noted that during the relevant time, at certain visits to the Clinic for Rheumatic Diseases, Ms. Hallman experienced eighteen out of eighteen tender points, a marker for fibromyalgia. R. 31, 350, 364, 374. However, there were also visits where Ms. Hallman only experienced two tender points. R. 31, 355, 368. The ALJ also noted that Ms. Hallman responded well to routine care, R. 32, which is supported by the evidence in the record. Ms. Hallman was generally scheduled for three-month, R. 365, or six-month, R. 351, 361, 375, follow-up appointments. And she was often treated with injections for tender points and pain. R. 353, 365, 371. As noted by the ALJ, the record does not "consistently allege any significant side effects" from her fibromyalgia medications, and instead includes comments from Ms. Hallman that pain had "gotten some better" and that she was "doing fairly well" with an increased dose of Cymbalta. R. 229, 235.

The ALJ did not solely rely on daily activities in her credibility determination; the discussion of daily activities was one paragraph of a thorough residual functional capacity analysis under binding precedent and regulations. R. 29–32. The ALJ specifically relied on Ms. Hallman's testimony that she could perform independent self-care and personal hygiene, light household cleaning, preparing simple meals, driving, caring for her young children, and occasionally attending church as evidence that she could perform "less than a full range of light work." R. 32. Here,

the ALJ did not disregard Ms. Hallman's symptoms and daily activities, but instead found that a restricted range of light work described in the residual functional capacity was "supported by treatment notes." R. 32. The ALJ properly applied the pain standard and articulated explicit and adequate reasons for discrediting some of Ms. Hallman's subjective complaints based on inconsistencies with the objective medical evidence on record. *See Moore*, 405 F.3d at 1212 (stating that subjective symptom determinations are the province of the ALJ). Substantial evidence supports the ALJ's credibility determination, as adopted by the Appeals Council, including her discussion of Ms. Hallman's fibromyalgia and daily activities.

## VI.   Conclusion

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 22nd day of March, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE